UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JENNY CANTRELLE PLAISANCE                    CIVIL ACTION

VERSUS                                       NUMBER: 17-05487

NANCY A BERRYHILL, ACTING                    SECTION: "F"(5)
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying Plaintiff's application for Supplemental Security Income ("SSI") benefits.  (Rec. docs. 9, 11).

Jenny Cantrelle Plaisance, Plaintiff herein, filed the subject application for SSI benefits on March 11, 2014, alleging disability as of December 31, 2013.  (Tr. pp. 157-162).  In a "Disability Report-Adult" form that appears in the administrative record below, the conditions limiting Plaintiff's ability to work were identified as congenital fusions at C1-3 and C4-5, a surgical fusion at C3-4, a fusion at T11-12, ankylosing spondylitis, Waardenburg Syndrome, complete deafness in the left ear and partial deafness in the right, eosinophilic esophagitis, allergies to foods and dust mites, and chronic reflux.  (Tr. pp. 174-180).[1] Plaintiff's application for SSI benefits was denied at the initial level of the Commissioner's administrative review process on July 16, 2014.  (Tr. pp. 103-106)  Pursuant to her request, a hearing *de novo* before an Administrative Law Judge ("ALJ") went forward on March 3,

---

[1] In a separate "Disability Report-Field Office" form, it was reported that Plaintiff had previously filed an application for Disability Insurance Benefits that was denied at the initial level of the Commissioner's administrative review process on August 24, 2010 and was apparently not appealed further.  (Tr. pp. 171-173).

2016 at which Plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 109-111, 76-88). On May 17, 2016, the ALJ issued a written decision in which he concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 55-75). The Appeals Council ("AC") subsequently denied Plaintiff's request for review of the ALJ's decision on April 27, 2017, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 1-7). It is from that unfavorable decision that the Plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In her cross-motion for summary judgment, Plaintiff frames the issue for judicial review as follows:

> Whether the Administrative Law Judge erred in failing to grant the claimant disability insurance benefits where substantial medical documented evidence shows that the claimant is disabled from her former job and the government failed to properly take into account the substantial medical and vocational evidence and testimony that the claimant is unable to engage in any gainful activity.

(Rec. doc. 9-1, p. 2).

Relevant to the resolution of the foregoing issue are the following findings that were made by the ALJ:

1. The claimant has not engaged in substantial gainful activity since February 24, 2014, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: spine disorders including congenital and surgical fusions of the cervical and thoracic spine and ankylosing spondylitis of the lumbar spine, and bilateral sensorineural hearing loss (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

4.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that she would be limited to work that did not require fine hearing or frequent telephone use.  She would also need to avoid objects approaching from the side and should not drive or operate moving machinery at work.

5.  The claimant has no past relevant work (20 CFR 416.965).

6.  The claimant was born on April 3, 1983 and was 30 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since February 24, 2014, the date the application was filed (20 CFR 416.920(g)).

(Tr. pp. 60, 63-64, 70, 71).

Judicial review of the Commissioner's decision to deny SSI benefits is limited to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards.  *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the

3

Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues de novo, nor may it substitute its judgment for that of the Commissioner. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking SSI benefits bears the burden of proving that she is disabled within the meaning of the Social Security Act. *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months". 42 U.S.C. §1382c(a)(3)(A). Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. *Harrell*, 862 F.2d at 475. In making this determination, the Commissioner undertakes the five-step sequential analysis set forth in 20 C.F.R. §416.920, as follows:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.

4

5.  If an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 2294 n. 5 (1987). If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. *Fraga*, 810 F.2d at 1304 (citing *Lawler v. Heckler*, 761 F.2d 195, 198 (5th Cir. 1985)). Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *Fraga*, 810 F.2d at 1302.

The medical evidence that was generated during the relevant time period begins with records from the Lady of the Sea General Hospital in Cut Off, Louisiana, where Plaintiff underwent radiological studies on March 6, 2014. X-rays of the pelvis and the hips were normal. (Tr. p. 263). Further studies were performed on Plaintiff's cervical spine on April 11, 2014 which demonstrated evidence of a congenital fusion of C1, C2, and C3; an anterior spinal fusion at C3-4 with metallic hardware in place; limited range of motion in extension and flexion; and severe osteoporosis. (Tr. pp. 262, 265). A CT spine density scan was then performed on April 23, 2014 which revealed mild osteopenia of the lumbar spine and the attending radiologist noted that the osteoporosis of Plaintiff's cervical spine may be exaggerated by post-surgical change and diffuse. (Tr. p. 264).

On May 31, 2014, Plaintiff, who was then 31 years of age, was consultatively evaluated by Dr. Thomas Turnage of Point of Care Health Care Solutions in Galliano, Louisiana. His report from the evaluation documents first noted congenital fusions of C1-3 and C4-5 and a 2002 surgical fusion of C3-4 which caused daily constant pain and stiffness, improved with rest and pain medications, exacerbated by exertion and sleeping in certain positions with no numbness but occasional bilateral arm weakness. Noted second was a spontaneous fusion of T11-T12 leading to occasional sharp pain that was incited by deep breaths but was unaccompanied by incontinence, saddle anesthesia, lower extremity weakness, or falls. Third on the "Major Problem List" was ankylosing spondylitis with constant lower back pain that was successfully treated with Percocet, Ibuprofen, Soma, and occasional steroid injections. Listed fourth was Waardenburg Syndrome/hearing difficulty with decreased hearing in the right ear and complete deafness in the left ear leading to problems communicating with others, speaking, and hearing conversations on the telephone. The final medical condition identified in Dr. Turnage's report was eosinophilic esophagitis/GERD, diagnosed in October of 2013 after dysphagia with food for six years and treated with an inhaled steroid which helped with Plaintiff's symptoms.

In the "Social History" portion of the doctor's note it was reported that Plaintiff was able to assist/perform household activities, to dress/feed herself independently, to drive, and to visit with family and friends. In terms of her functional level of activity, it was estimated that Plaintiff could lift 10 pounds, sit for 30 minutes, stand for one hour, and walk 100 yards. Upon physical examination, Plaintiff favored her right ear due to decreased ability to hear in her left ear resulting in an increased volume of speech to communicate effectively. She also had an occasional speech impediment. Neurologically, Plaintiff had 5/5

strength bilaterally in the upper and lower extremities with good tone and normal movement; reflexes were +2 bilaterally in the biceps, triceps, quadriceps, and Achilles tendon and sensation was intact bilaterally in the upper and lower extremities. Plaintiff had a normal range of motion in the neck, back, trunk, hips, and the upper and lower extremities bilaterally. Gait was normal and she was able to walk on both heels and toes. Grip strength was also normal bilaterally as was Plaintiff's ability to push, pull, reach, crouch, squat, and stoop. She could climb on and off the examination table and dress/undress independently.

In summarizing his findings, Dr. Turnage noted that Plaintiff had no tenderness in the cervical region, a full range of motion in the cervical spine, 5/5 upper extremity strength bilaterally, and no gross sensory deficits. With respect to the spontaneous fusion at T11-T12, the doctor further noted that Plaintiff had no tenderness to palpation of the thoracic area, full range of motion in the spine, and 5/5 strength in the legs bilaterally with no gross sensory deficits. As for Plaintiff's ankylosing spondylitis, Dr. Turnage observed that the x-ray studies that were performed at the Lady of the Sea General Hospital revealed none of the characteristic abnormalities associated with such a condition and that she had a normal range of motion in the lumbar spine with normal gait and station. Addressing Plaintiff's hearing deficit, the doctor noted that the correct name of the disorder is Waardenburg Syndrome and that Plaintiff had experienced problems maintaining employment and having conversations on the phone. Plaintiff favored her right ear, often needing things repeated and the volume of voice elevated in order to hear along with an "occasional speech impediment." Finally, Plaintiff was under the care of Dr. Pellegrin for her esophagitis but her oropharynx was normal and she did not complain of any symptoms of reflux. (Tr. pp. 272-288). In an addendum dated June 18, 2014, Dr. Turnage described Plaintiff's speech

impediment as involving slightly slurred speech, only occurring with certain sounds and consonants, but comprehensible nonetheless. (Tr. p. 280).

Plaintiff underwent a consultative audiological evaluation on July 11, 2014 at the hands of K.L. Allred, Doctor of Audiology. Plaintiff's hearing had worsened such that she had more difficulty hearing in loud, noisy places. Although she could hear over the telephone, Plaintiff did have difficulty in placing a sound, she experienced head noises or ringing in the ears, and she had spells of dizziness or difficulty keeping balance while walking. Plaintiff used Bicross hearing aids but they were not effective. It was felt that Plaintiff would have difficulty localizing to sound and understanding speech at a distance, in the presence of background noise, or when the speaker was not facing her. (Tr. pp. 282-284).

On October 7, 2014, Plaintiff was evaluated by Dr. Christopher Maulucci of the Tulane Medical Center Neurology Clinic. The chief complaint was posterior neck pain at the level of "10." She also complained of severe paresthesias affecting the upper extremities bilaterally which occurred whenever she had her arms raised. Plaintiff denied difficulty with fine motor tasks or with her gait but she had experienced several near syncopal episodes when flexing her neck in which her vision became dim but there was no loss of consciousness. Plaintiff's past surgical history was positive for an anterior cervical discectomy and fusion at C3-4 in 2002 post trauma, a procedure that was very successful. A recent rheumatologic workup had revealed positive antinuclear antibody and Plaintiff also suffered from severe dysphagia. A swallow study had thus been scheduled as well as an EMG to better address her upper extremity paresthesias. Medications at the time consisted of Percocet, Soma, Ibuprofen, Dexilant, Vitamin D, and Alvesco.

Upon physical examination, cranial nerves II through XII were intact except for cranial nerve VIII bilaterally and severe hearing loss was present in both ears, the left worse than the right. Plaintiff had full strength bilaterally in the upper extremities except for 4/5 strength in her left interossei and finger flexors. There was full strength bilaterally in the lower extremities and sensation was intact from C2 to S1 bilaterally to light touch. Plaintiff had a positive Hoffman sign on the left and 3+ biceps and brachial radialis reflexes on the left but negative Spurling and Tinel signs and she was able to perform tandem gait without difficulty. The assessment was degenerative disc disease of the cervical spine and vertebral basilar insufficiency.

In connection with the evaluation, Plaintiff underwent MRI studies of the cervical spine that demonstrated preservation of normal lordosis and an artifact at C3-4, secondary to her anterior cervical discectomy and fusion. However, there did not appear to be any significant central canal compromise at any level. There was a disc herniation at C5-6 which minimally abutted the thecal sac and caused mild foraminal stenosis bilaterally. X-rays of the cervical spine revealed evidence of the prior fusion at C3-4 as well as a congenital fusion of the posterior elements of C2 and C3 and a fusion of C4-5 as a result of ankylosing spondylitis. Based on the evaluation findings, Dr. Maulucci did not believe that Plaintiff's symptoms were consistent with cervical myelopathy, nor was there any clear dermatomal or myotomal distribution of her symptoms. Given Plaintiff's severe neck pain, the doctor proposed to obtain flexion-extension views of the cervical spine to determine the existence of any mechanical instability as well as a computed tomography scan. (Tr. pp. 341-344). The proposed flexion-extension views were obtained that same day and revealed the C3-4 anterior fusion and discectomy with periscrew lucencies around the C3 screws that may

signify loosening; an interbody and posterior element bony fusion at C2-3 and C4-5; uncovertebral hypertrophy at C6-7; and no evidence of acute fracture, listhesis, or dynamic instability.  (Tr. pp. 360-361).

Pursuant to a referral from Dr. Birdsall, on October 15, 2014, Plaintiff was seen by Dr. Luis Espinoza for a second opinion as to whether she suffered from ALS.  Plaintiff complained of pain "all over," at a level of "7," mainly to the back and neck.  Upon physical examination, Plaintiff had decreased range of motion and tenderness to palpation of the back but otherwise no swelling or deformity and no clubbing, cyanosis, or edema in the extremities. A neurologic examination was normal.  The assessment was nonspecific immunological findings, unspecified backache, and neck pain with no clinical evidence suggestive of an underlying autoimmune disorder or ALS.  Plaintiff was to follow up in three weeks.  (Tr. pp. 305-306).

On October 17, 2014, Plaintiff underwent an EMG and nerve conduction studies of the upper extremities in an attempt to better diagnose her neck pain, hand numbness, and pain radiating from the neck down the arms.  Those studies were characterized as abnormal secondary to the presence of mild bilateral C6 radiculopathy and mild right carpal tunnel syndrome ("CTS").  When compared to findings previously obtained in 2010, the left-sided radiculopathy and the carpal tunnel syndrome were believed to be new.  (Tr. pp. 322-324, 329-331).  A CT scan, without contrast, of the cervical spine was subsequently performed on October 22, 2014, which revealed postsurgical changes of an anterior cervical fusion and corpectomy at C3-4 with an apparent congenital body fusion of C2-3 and C4-5 with anomalous atlantoaxial articulation but no evidence of hardware loosening.  (Tr. pp. 358-359, 362).

Plaintiff returned to Dr. Espinoza on November 5, 2014, reporting neck and lower back pain at a level of "8" along with stiffness. Other related symptoms included fatigue, headaches, malaise, lack of energy, difficulty sleeping and transient numbness to the hands and feet. Plaintiff's past medical history was positive for a motor vehicle accident resulting in severe neck injury and eventually a cervical spine fusion. On physical examination, Plaintiff had decreased range of motion and tenderness to palpation of the neck and back but straight leg raising was negative. Active tender points numbered 16/18 and there was no clubbing cyanosis, or edema of the extremities. The assessment was myalgia and myositis with no clinical evidence of underlying ankylosing spondylitis. Plaintiff was started on Gabapentin. (Tr. p. 303-304).

Plaintiff was seen again by Dr. Maulucci on November 11, 2014 for the purpose of obtaining the results of a recent dynamic cerebral angiogram. Plaintiff reported that the Gabapentin prescribed by Dr. Espinoza had relieved some of her neuropathic pain with her chief complaint being focal pain at the level of "7" in the posterior aspect of her neck. She also reported occasionally dropping objects with her right hand. Physical examination results were essentially unchanged from the previous visit of October 7, 2014. In terms of the angiogram test results, there was no evidence of vascular compromise on flexion and extension and given the unremarkable findings, the doctor did not believe that any procedure would be of benefit to Plaintiff. The previous EMG had demonstrated a mild bilateral C6 radiculopathy and mild right median neuropathy but the former condition was not believed to be disabling and the latter condition was to initially be treated only with a brace in an attempt to exhaust non-surgical options. (Tr. pp. 337-340). At a further follow-up appointment with Dr. Espinoza on December 9, 2014, Plaintiff complained of pain "all

over" at a level of "6." Nevertheless, she reported feeling better with less pain and sleeping somewhat better as well, expressing satisfaction with her medication regimen and exercising and walking several days per week. Active tender points remained 16/18 in the musculoskeletal system. The assessment was myalgia and myositis; Plaintiff was to remain on her current medication regimen and was encouraged to exercise. (Tr. pp. 301-302).

The next medical records were generated on February 6, 2015 when Plaintiff was seen by Dr. Jamie Huddleston for further evaluation of her neck pain that radiated into both arms and was at a level of "8" along with numbness, worse with activity and relieved somewhat with NSAIDs. Hand numbness occurred only rarely. On physical examination, Plaintiff had normal bulk and tone and 5/5 strength bilaterally in the upper and lower extremities with 2+ reflexes. In connection with his evaluation, Dr. Huddleston reviewed the previous EMG test results, as well as those from a September 2014 MRI of the cervical spine. He recommended consultation with interventional pain management to consider a cervical epidural steroid injection ("ESI"), maintaining Plaintiff on Gabapentin to relieve her fibromyalgia pain, obtaining a second opinion from rheumatology to rule out ankylosing spondylitis, reviewing the report of the cerebral angiogram, and monitoring Plaintiff's CTS symptoms, which were characterized as "not very bothersome." (Tr. pp. 325-328).

On June 16, 2015, Plaintiff was seen by Licensed Professional Counselor Suzanne Saia of the Lafourche Behavioral Health Center for interpersonal issues with her 16 year-old son. Despite drinking only rarely, Plaintiff was on probation for DWI at the time and her environment was described as moderately stressful secondary to conflict with her son and physical pain related to fibromyalgia and back problems. The assessment was adjustment disorder with anxiety and Plaintiff was counseled on coping strategies. (Tr. pp. 294-297).

Plaintiff subsequently underwent a CT scan, without contrast, of the maxillofacial/sinus area on July 23, 2015.  That testing revealed mild chronic appearing left maxillary sinusitis with what appeared to be mucoperiosteal thickening but no acute air fluid levels; ostiomeatal units that were widely patent; dysplastic changes of the craniovertebral junction with fusion of C2 and C3 and evidence of basilar invagination; and, degenerative changes of the temporomandibular joints.  (Tr. pp. 310-311, 315-316).

A CT scan, without contrast, of Plaintiff's head was performed on August 13, 2015 following an incident two weeks earlier in which she fell and struck her head on a nightstand, rendering her unconscious.  The impression was medial supraorbital soft tissue swelling with no evidence of significant intracranial abnormality and a chronic appearing left ethmoid sinusitis.  (Tr. p. 312).  X-rays of the cervical spine were also taken, which revealed a congenital abnormality of the cervical spine with what appeared to be dysplastic and hypoplastic changes of the craniovertebral junction and fusion of the C2 and C3 vertebral bodies; surgical fusion of C3 and C4 with a curler type spacer; a probable congenital fusion of C4 on C5; and no obvious acute subluxation.  (Tr. pp. 313-314).

As noted earlier, a hearing before an ALJ went forward on March 3, 2016.  After the documentary evidence that was then extant was admitted into evidence, Plaintiff took the stand and was questioned by the ALJ.  She was 32 years old at the time, possessed a driver's license, and was able to drive.  Medications included Percocet, Solmux, Dexilant, Trazodone, Wellbutrin, Vitamin D, Klonopin, Relafen, Gabapentin, Flonase, and an unidentified stomach medication.  Side effects from those medications were sleepiness and nausea.  In terms of her neck, Plaintiff testified to ongoing discomfort and a problematic C6 disc causing radiating pain down both arms, CTS in the right hand, loss of strength in the hand, and numbness in

the arm.  Plaintiff also complained of a limited range of motion in the upper extremities, an inability to lift heavy objects, and a tendency to drop things with her right hand when it became numb.  Right CTS surgery was purportedly being discussed by one of Plaintiff's physicians.

With respect to her hearing deficit, Plaintiff testified to a congenital hearing loss in the left ear and a gradual loss of hearing in the right.  Hearing aids were ineffective as they picked up too much background noise.  Colder temperatures reportedly affected Plaintiff's mobility and her children performed the bulk of the household chores.  She had last worked for 18 months as the manager of a cleaning business overseeing a workforce of 16.  In the previous 15 years, Plaintiff had also worked at a Walmart and a hardware store for short periods of time but eventually ended up quitting those jobs because of the required heavy lifting.  Increasingly, Plaintiff's worsening hearing difficulties were impacting her level of functioning and she tended to stay at home more.  (Tr. pp. 78-84).

Lionel Bordelon, a VE, was the next witness to take the stand.  After briefly touching upon his qualifications, Bordelon began by classifying the exertional and skill demands of Plaintiff's past work as follows:  cleaning company office manager – sedentary with an SVP of 7; retail salesperson – light with an SVP of 5; and, cashier/checker – light with an SVP of 3.  The ALJ then posed a hypothetical question to Bordelon which assumed a person of Plaintiff's age, education, and work experience who was limited to light-level work and who, as a result of hearing problems, would require employment that did not require fine hearing or frequent telephone use, included the avoidance of objects approaching from the side, and involved no driving or operating machinery.  Based upon the limitations set forth in the hypothetical question, the VE testified that the described individual would have difficulty

performing Plaintiff's past work as a retail salesperson or a cashier/checker. However, the individual described in the hypothetical question could function as a weigh scale operator or a hand packer, with significant numbers of such jobs existing in the national and local economies. To the hypothetical question as originally framed the ALJ added that, owing to severe pain, the described individual would be unable to sustain sufficient concentration, persistence, or pace to do simple, routine tasks on a regular and continuing basis in a customary workday and workweek. With that added limitation in mind, the VE testified that there would be no jobs that the described individual could perform. (Tr. pp. 84-87). Upon being tendered to Plaintiff's counsel for cross-examination, the VE was asked whether Plaintiff's previous jobs as a salesperson and cashier properly qualified as past relevant work given the brief periods of time in which she had performed them. In response, the VE testified "... that's more towards an employer question." The hearing was then concluded. (Tr. pp. 87-88).

As noted earlier, the ALJ issued his adverse decision on Plaintiff's application for SSI benefits on May 17, 2016. (Tr. pp. 55-76). Subsequent thereto, Plaintiff underwent radiologic studies of the lumbar spine on May 25, 2016 which revealed a congenital anomaly of the T12 vertebral body with two pedicles noted on the left, the lower one being hypoplastic and the other one being associated with a dominant left-sided rib, as well as disc space narrowing at L5-S1. (Tr. p. 363). On June 15, 2016, Dr. Gary Birdsall authored a "To Whom It May Concern" letter in which he opined that Plaintiff was "... totally disabled and unable to perform any type of job." Dr. Birdsall reported having seen Plaintiff on a monthly basis for an unspecified period of time and referring her to numerous specialists for her conditions which were identified as ankylosing spondylitis, sleep apnea, fibromyalgia,

chronic back pain, anxiety, hypothyroidism, and severe hearing loss.  In the doctor's opinion, Plaintiff was unable to work due to severe pain to her back and neck that required opiate pain medications, muscle relaxers, and anti-inflammatories, some of which caused side-effects that further limited her ability to work.  Dr. Birdsall also opined that Plaintiff was unable to stand, sit, or bend for long periods of time and that her hearing loss affected her communications with others.  (Tr. p. 364).

The final medical records that were admitted in the administrative proceedings below document Plaintiff's presentation to the NOMC Spine Center on July 13, 2016, the chief complaint being neck pain with radiculopathy to the upper extremities, the right greater than the left.  The pain was described as shooting with no apparent exacerbating or alleviating factors but with associated numbness and tingling in the hands.  There was also mild subjective global weakness.  Upon physical examination, Plaintiff had a normal gait and station with no difficulty on toe or heel walking.  Cervical range of motion was limited secondary to pain and there was mild tenderness to palpation.  In terms of the musculoskeletal system, there was no pain with range of motion of the bilateral shoulders and elbows and normal bulk and contour of the hands bilaterally.  Neurologically, there was normal strength and tone in all major motor groups bilaterally in the upper and lower extremities and normal sensation to light touch in the C5-T1 and L2-S1 dermatomes bilaterally.  Deep tendon reflexes were symmetric 1+ bilaterally in the upper and lower extremities.  The assessment was Klippel-Feil Syndrome.  A CT scan and an MRI of Plaintiff's cervical spine were to be obtained for further evaluation; conservative care was to be continued in the form of a cervical ESI.  (Tr. pp. 365-375).

In her cross-motion for summary judgment, Plaintiff broadly challenges the ALJ's decision to deny her SSI benefits, arguing that the medical evidence of record demonstrates that she "... is disabled from her former job ..." and that "... the government failed to properly take into account the substantial medical and vocational evidence and testimony that the claimant is unable to engage in any gainful activity." (Rec. doc. 9-1, p. 2). Plaintiff goes on to identify the various conditions that she has been diagnosed as suffering from, test results supporting those diagnoses, and medications that she has been prescribed over time. (*Id.* at pp. 2-6). Finally, in the concluding portion of her supporting brief, Plaintiff argues that while her conditions do not rise to the level of a listed impairment, the combination of them is equivalent to a listed impairment, thus rendering her "... functionally and anatomically disabled." (*Id.* at p. 6). For the reasons that follow, the Court believes that the Commissioner's decision is supported by substantial evidence and should be affirmed.

In addressing Plaintiff's challenge, the Court begins with the well-established proposition that "... the mere existence or diagnosis of a condition and its attendant symptomology does not equate with a finding of disability under the Social Security Act." *Broomfield v. Colvin*, No. 14-CV-2434, 2015 WL 9874152 at *3 (E.D. La. Dec. 28, 2015), *adopted*, ___ WL ___ (E.D. La. Jan. 20, 2016)(citing *Randall v. Astrue*, 570 F.3d 651, 658-59 (5th Cir. 2009)). "Rather, the appropriate inquiry is whether a claimant's impairments result in functional limitations that render ... [her] unable to perform ... [her] past work or any other work." *Id.* (citing *Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990)). Irrespective of the number of conditions that Plaintiff has been diagnosed as suffering from, the question becomes whether substantial evidence supports the Commissioner's decision that Plaintiff retained the residual functional capacity to perform some work in spite of them.

In the present case, the Plaintiff alleged disability as of December 31, 2013 but the significance of that date is unclear.  In terms of the evidence that was generated during the relevant time period, x-rays of Plaintiff's pelvis and hip that were taken on March 6, 2014 were unremarkable.  On April 4, 2014, Plaintiff completed the Administration's "Function Report-Adult" form, in which she provided information on how her conditions limited her activities.  (Tr. pp. 196-203).  Although Plaintiff reported there that she was unable to sit, stand, or walk for long periods of time or to lift heavy objects, she had no problem with personal care, was able to prepare meals for herself and her four children, could perform household cleaning and do laundry, could drive and go out alone, could manage her finances, and could socialize with others.  (*Id.*).

As part of his consultative evaluation on May 31, 2014, Dr. Turnage also addressed Plaintiff's functionality, noting that she could assist/perform household activities, dress/feed herself independently, drive, and visit with family and friends.  The doctor estimated that Plaintiff could lift 10 pounds, sit for 30 minutes, stand for one hour, and walk 100 yards at a time.  Plaintiff's ability to engage in such activities is not indicative of someone who is unable to perform any work whatsoever.  *Fraga*, 810 F.2d at 1302 (ability to walk one-half block, to attend church, and to drive 20 - 30 miles per week supported a finding of "not disabled").  Following a physical examination, Dr. Turnage found that Plaintiff had 5/5 strength bilaterally in the upper and lower extremities with good tone and normal movement; reflexes and sensation were within normal limits.  Plaintiff had a normal range of motion in the neck, back, trunk, hips, and the upper and lower extremities.  Her gait was normal, heel-to-toe walking was unaffected, and Plaintiff had adequate grip strength and could push, pull, reach, crouch, squat, and stoop.  In summary, Dr. Turnage observed that

Plaintiff had no tenderness in the cervical region, a full range of motion in the cervical spine, 5/5 upper extremity strength bilaterally, and no gross sensory deficits. Plaintiff also had no tenderness to palpation of the thoracic area with a full range of motion in the thoracic spine and 5/5 strength in the legs bilaterally with no gross sensory deficits. After reviewing recent x-ray studies, the doctor opined that Plaintiff had none of the characteristic abnormalities typically associated with ankylosing spondylitis and that she had a normal range of motion in the lumbar spine with normal gait and station. Plaintiff also needed things repeated to her at an elevated volume in order to be understood and her speech, although slightly slurred, was still comprehensible. Supported as it was by the evidence of record, the ALJ gave Dr. Turnage's opinions "great weight." (Tr. p. 68). That was the ALJ's prerogative in the first instance. *Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991); *Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 129 (5th Cir. 1991); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990).

Admittedly, Plaintiff's hearing had worsened by the time of her audiological evaluation on July 11, 2014 such that she would have difficulty localizing to sound and understanding speech at a distance, in the presence of background noise, or when the speaker was not facing her. Those limitations, however, were properly accounted for by the ALJ in the hypothetical question that he posed to the VE at the administrative hearing. (Tr. pp. 85-86). At a subsequent evaluation by Dr. Maulucci on October 7, 2014, Plaintiff had no difficulty with fine motor skills or gait, had full strength bilaterally in the upper extremities except for 4/5 strength in the left hand muscles, and had full strength bilaterally in the lower extremities with intact sensation from C2 to S1. She was able to perform tandem gait without difficulty. The diagnosis was degenerative disc disease of the cervical spine and vertebral

basilar insufficiency.  MRI studies that were conducted at that time revealed normal lordosis through the cervical spine and no significant central canal compromise at any level.  A disc herniation at C5-6 caused only mild foraminal stenosis bilaterally.  Dr. Maulucci did not believe that Plaintiff's symptoms were consistent with cervical myelopathy.  Flexion-extension views revealed the fusions at C3-4, C2-3, and C4-5 but no evidence of acute fracture, listhesis, or dynamic instability.

At a subsequent evaluation by Dr. Espinoza on October 15, 2014, no evidence of an underlying autoimmune disorder or ALS was detected.  EMG/NCS tests that were performed shortly thereafter demonstrated only mild bilateral C6 radiculopathy and mild CTS on the right.  Gabapentin prescribed by Dr. Espinoza on November 5, 2014 was effective in relieving some of Plaintiff's neuropathic pain and a cervical angiogram produced unremarkable results for which no surgical procedure was deemed warranted.  Dr. Maulucci did not believe Plaintiff's mild bilateral C6 radiculopathy to be disabling and her CTS was to be treated with only a brace.  The absence of findings warranting more significant treatment may properly be considered by an ALJ in adjudicating a claimant's disability status.  *Clayborne v. Astrue*, 260 Fed.Appx. 735, 737 (5th Cir. 2008); *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987).

On December 9, 2014, Plaintiff reported to Dr. Espinoza that she was feeling better with less pain and improved sleep, endorsing her medication regimen and exercising and walking several days per week.  She was to remain on that regimen and was encouraged to exercise more.  When seen by Dr. Huddleston on February 6, 2015, Plaintiff had normal bulk and tone and 5/5 strength bilaterally in the upper and lower extremities and her CTS symptoms were described as "not very bothersome."  Although the opinions of Licensed Professional Counselor Saia are entitled to diminished weight because she was not an

"acceptable medical source" within the meaning of the Regulations that were in effect at the time of the ALJ's decision, 20 C.F.R. §416.913(a)(1)-(5), Saia only counseled Plaintiff on coping strategies in the wake of an assessment of adjustment disorder with anxiety.

On June 15, 2016, Dr. Birdsall executed a "To Whom It May Concern" letter in which he opined that Plaintiff was totally disabled.  That letter is entitled to little weight as it was unaccompanied by any contemporaneously recorded, medically acceptable findings, *Warncke v. Harris*, 619 F.2d 412, 417 (5th Cir. 1980), and the Court is directed to no treatment records from Dr. Birdsall that were even generated during the relevant time period. Moreover, the opinion expressed by the doctor embraces the ultimate issue that is reserved to the Commissioner.  20 C.F.R. §416.927(d)(1).  In any event, approximately one month after Dr. Birdsall authored his missive, Plaintiff was evaluated at the NOMC Spine Center for complaints of neck pain with radiculopathy to the upper extremities, the right greater than the left.  Upon physical examination, Plaintiff had a normal gait and station and was able to heel-to-toe walk.  Although range of motion to the cervical spine was limited to an unspecified degree secondary to pain with mild tenderness to palpation, there was no pain with range of motion to the shoulders, elbows, or hands; strength and tone were normal in all major motor groups in the upper and lower extremities; and, sensation and deep tendon reflexes were within normal limits.  The only treatment recommended was further testing and possibly a cervical ESI.

In the concluding portion of her supporting brief, Plaintiff acknowledges that her conditions failed to satisfy the criteria of any one of those set forth in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, App. 1, but suggests that the combination of her impairments was functionally equivalent to a listed impairment.  As aptly noted by the

Commissioner, whether a claimant meets the requirements of a listed impairment is generally an objective question of documented medical fact, Social Security Ruling ("SSR") 96-5p, 1996 WL 374183 at *3, the criteria in the medical listings are "demanding and stringent," *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994), and a claimant must provide medical findings that support each of the criteria for the equivalent impairment determination. *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990). Here, while Plaintiff cites various diagnoses she has received over the years, she fails to identify the specific Listing(s) against which medical equivalence can be measured. In making his third-step findings, the ALJ, on the other hand, "… considered the criteria of Sections 1.00, 2.00, *et seq.*, in general, of the Listing of Impairments … but the evidence … does not establish that the claimant's impairments meet or equal the severity criteria of any listed impairment." (Tr. p. 63). At the hearing level, the responsibility for determining medical equivalence lies solely with the ALJ. 20 C.F.R. §416.926(e)(3). Substantial evidence supports that determination.

The Court is directed to no medical records generated during the relevant time period wherein any limitations whatsoever were placed on Plaintiff's activities. *Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995); *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1989). For his part, Dr. Turnage found that Plaintiff could lift 10 pounds, sit for 30 minutes at a time, stand for one hour at a time, and walk 100 yards. In reviewing the medical evidence of record that was then extant, Dr. Jerry Faludi, a state-agency medical consultant with considerable expertise in Social Security proceedings whose opinions must be considered by the ALJ, 20 C.F.R. §416.927(e)(2)(i), similarly concluded that Plaintiff was capable of performing a range of light-level work consistent with the hypothetical question that was posed to the VE by the

ALJ.  The Plaintiff has not rebutted the ALJ's decision that Plaintiff was capable of performing the jobs that were so identified.

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that Plaintiff's motion for summary judgment be denied, that Defendant's motion for summary judgment be granted, and that Plaintiff's suit be dismissed.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996)(en banc).[2]

New Orleans, Louisiana, this _2nd_ day of _____February_____, 2018.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

---

[2] *Douglass* referenced the previously-applicable 10-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to 14 days.